UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JOSHUA BRIAN NIBBELINK,

      Petitioner,

v.

                                    Case No. 3:20-cv-1273-HES-LLL

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

      Respondents.

_____

## ORDER

### I. Status

Petitioner Joshua Brian Nibbelink, an inmate of the Florida penal system, initiated this action on November 3, 2020, by filing a pro se Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (Doc. 1) and a Memorandum of Law in Support (Doc. 5). Petitioner challenges a 2015 state court (Duval County, Florida) judgment of conviction for first-degree felony murder, kidnapping, and robbery. *See* Doc. 1. Respondents filed an Answer (Doc. 10), with exhibits (Docs. 10-1 to 10-13; Ex). Petitioner was

afforded an opportunity to file a reply, but he did not do so. This case is ripe for review.[1]

## II. Governing Legal Principles

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal petition for habeas corpus. *See Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d 600, 642 (11th Cir. 2016). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" *Id.* (quoting *Greene v. Fisher*, 565 U.S. 34, 38 (2011) (quotation marks omitted)). As such, federal habeas review of final state court decisions is "'greatly circumscribed' and 'highly deferential.'" *Id.* (quoting *Hill v. Humphrey*, 662 F.3d 1335, 1343 (11th Cir. 2011) (quotation marks omitted)).

---

[1] In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007); *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1318-19 (11th Cir. 2016). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro*, 550 U.S. at 474. The pertinent facts of this case are fully developed in the record before the Court. Because the Court can "adequately assess [Petitioner's] claim[s] without further factual development," *Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the claim on the merits. *See Marshall v. Sec'y, Fla. Dep't of Corr.*, 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue a written opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. *See Harrington v. Richter*, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation, the United States Supreme Court has instructed:

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The presumption may be rebutted by showing that the higher state court's adjudication most likely relied on different grounds than the lower state court's reasoned decision, such as persuasive alternative grounds that were briefed or argued to the higher court or obvious in the record it reviewed. *Id.* at 1192, 1196.

If the claim was "adjudicated on the merits" in state court, § 2254(d) bars relitigation of the claim unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented

3

in the State court proceeding." 28 U.S.C. § 2254(d); *Richter*, 562 U.S. at 97–98.

The Eleventh Circuit describes the limited scope of federal review pursuant to

§ 2254 as follows:

> First, § 2254(d)(1) provides for federal review for claims of state courts' erroneous legal conclusions. As explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000), § 2254(d)(1) consists of two distinct clauses: a "contrary to" clause and an "unreasonable application" clause. The "contrary to" clause allows for relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413, 120 S. Ct. at 1523 (plurality opinion). The "unreasonable application" clause allows for relief only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*
>
> Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of the petitioner's claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's factual findings "by clear and convincing evidence." *See Burt v. Titlow*, 571 U.S. ---, ---, 134 S. Ct. 10, 15, 187 L.Ed.2d 348 (2013); *accord Brumfield v. Cain*, 576 U.S. ---, ---, 135 S. Ct. 2269, 2282, 192 L.Ed.2d 356 (2015). Whatever that "precise relationship" may be, "'a state-court factual

4

> determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Titlow*, 571 U.S. at -- -, 134 S. Ct. at 15 (quoting *Wood v. Allen*, 558 U.S. 290, 301, 130 S. Ct. 841, 849, 175 L.Ed.2d 738 (2010)).

*Tharpe v. Warden*, 834 F.3d 1323, 1337 (11th Cir. 2016). Also, deferential review under § 2254(d) generally is limited to the record that was before the state court that adjudicated the claim on the merits. *See Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (stating the language in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made").

Thus, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013). "Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" *Tharpe*, 834 F.3d at 1338 (quoting *Richter*, 562 U.S. at 102-03). This standard is "meant to be" a "difficult" one to meet. *Richter*, 562 U.S. at 102. Thus, to the extent that the petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under 28 U.S.C. § 2254(d).

## B. Ineffective Assistance of Trial and Appellate Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's

5

performance falls below an objective standard of reasonableness and thereby prejudices the defense." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam) (citing *Wiggins v. Smith*, 539 U.S. 510, 521 (2003), and *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [*Strickland*,] 466 U.S. at 688, 104 S. Ct. 2052. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.*, at 689, 104 S. Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*, at 687, 104 S. Ct. 2052.
>
> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 694, 104 S. Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.*, at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*, at 687, 104 S. Ct. 2052.

*Richter*, 562 U.S. at 104. The Eleventh Circuit has recognized "the absence of any iron-clad rule requiring a court to tackle one prong of the *Strickland* test before the other." *Ward*, 592 F.3d at 1163. Since both prongs of the two-part *Strickland* test must be satisfied to show a Sixth Amendment violation, "a

court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." *Id.* (citing *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in *Strickland*: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> "[T]he standard for judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at ---, 131 S. Ct. at 788. But "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Id.* (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable — a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420, 173 L.Ed.2d 251 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied *Strickland*'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. *Richter*, 562 U.S. at ---, 131 S. Ct. at 788.

*Hittson v. GDCP Warden*, 759 F.3d 1210, 1248 (11th Cir. 2014); *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). In other words, "[i]n addition to the deference to counsel's performance mandated by *Strickland*, the AEDPA adds

7

another layer of deference — this one to a state court's decision — when we are considering whether to grant federal habeas relief from a state court's decision." *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (11th Cir. 2004). As such, "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

Claims of ineffective assistance of appellate counsel are governed by the same standards applied to trial counsel under *Strickland. See Tuomi v. Sec'y, Fla. Dep't of Corr.*, 980 F.3d 787, 795 (11th Cir. 2020); *Philmore v. McNeil*, 575 F.3d 1251, 1264 (11th Cir. 2009). The Eleventh Circuit has instructed:

> In assessing an appellate attorney's performance, we are mindful that "the Sixth Amendment does not require appellate advocates to raise every non-frivolous issue." *Id.* at 1130-31.[2] Rather, an effective attorney will weed out weaker arguments, even though they may have merit. *See id.* at 1131. In order to establish prejudice, we must first review the merits of the omitted claim. *See id.* at 1132. Counsel's performance will be deemed prejudicial if we find that "the neglected claim would have a reasonable probability of success on appeal." *Id.*

*Philmore*, 575 F.3d at 1264. Thus, appellate counsel's performance is prejudicial if the omitted claim would have a reasonable probability of success on appeal. *Id.* at 1265; *see Black v. United States*, 373 F.3d 1140, 1142 (11th Cir. 2004) (recognizing that to satisfy the prejudice prong, a petitioner must

---

[2] *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991).

show a reasonable probability that "but for the deficient performance, the outcome of the appeal would have been different").

### III. Procedural History

The following facts are taken from Petitioner's initial brief on direct appeal.

Brian Nibbelink[3] was tried with his twin brother, Jonathan, in August 2015. The State theorized that the Nibbelink brothers and accomplice Gary Shepersky accidentally suffocated drug dealer Dwight Martin ("Eskimo") during a robbery at the Nibbelink apartment on November 18, 2013. Brian Nibbelink's defense acknowledged his involvement in the victim's death, but disputed his role.

On the day of trial, Jonathan requested to represent himself and instructed his appointed attorney not to do anything at trial. The trial court denied his request to proceed pro se because of the late timing. Jonathan's lawyer did not make any opening or closing argument, cross examine any witnesses, or participate in the trial proceedings in front of the jury. Brian's attorney, Nah-Deh Simmons, was the only defense attorney to present a defense. The relevant testimony is as follows:

Stan Kulenok became friends with the Nibbelink twins in 2013. He could not tell the difference between the two brothers at trial. He knew Brian better. In 2013, Mr. Kulenok was taking painkillers and heroin. He took drugs with each of the brothers and he also bought drugs from them. He also talked with each of them about robbing drug dealers. These conversations took place about two months

---

3 Throughout the state court record, Petitioner is referred to by his first name (Joshua) and his middle name (Brian).

before the events in question. Mr. Kulenok did not know Dwight Martin, but he knew that he went by "Eskimo" or "E." Mr. Kulenok's brother was also friends with the Nibbelink twins. After . . . they had been charged with murder, Mr. Kulenok contacted the police to anonymously report his interaction with the Nibbelinks.

Mr. Kulenok had heard about the murder weeks after it had happened, but he waited over a year to contact the police. Brian had asked him to help rob a drug dealer and it was his understanding that no guns would be used. He wanted to rob . . . one because [he] had been robbed by a drug dealer in the past. Jonathan used a racial epithet to describe African-Americans and said they were going to "take the city back" from them. Mr. Kulenok ended up not going through with it and leaving town.

Alexander Kulenok, Stan's brother, is currently in a drug treatment center for heroin addiction. In 2013, he was using heroin and he spent a lot of time with the Nibbelinks. They had used drugs together and he sometimes obtained drugs from Brian. He last saw them just after the incident in question, but by then they had been through a falling out over drugs that had been stolen a week earlier. He also knew Eskimo and he had bought drugs from him in the past. He talked with the brothers, mainly Jonathan, about robbing drug dealers, including Eskimo. They had asked him to help with the robbery, but he wanted nothing to do with it. Jonathan was angry with Eskimo because of a past incident where he had tried to buy heroin at a gas station, but Eskimo acted like he did not know him. He thinks he heard Brian say that they were going to "take the city back" from black drug dealers, but he may have heard it from Jonathan.

After the events in question, Mr. Kulenok and his girlfriend ended up at the Nibbelink apartment. There was no electricity, running water, or food. It was

a tense atmosphere. Brian immediately asked Mr. Kulenok if he had heard from Eskimo. Mr. Kulenok explained that he had tried to call him, but his phone was off. The group did heroin together and eventually Jonathan took him aside and told him that they had killed Eskimo. Jonathan said that they had robbed him and "he could have lived if he kept his mouth shut." Mr. Kuleno[]k had no further contact with either brother.

A woman reported to police that she saw an abandoned car on the morning of November 20, 2013, as she walked to church. It smelled strongly of bleach. It appeared to an FDLE crime scene technician that somebody had tried to wipe the car down and the liner was missing from the trunk. Blood was present. A rental car contract signed by Eskimo was found inside.

Jennifer Monero was a drug addict in November 2013; she did drugs with both of the Nibbelink brothers. At some point, she met Gary Shepersky. One night, she approached Jonathan and Gary because she needed a ride. The group walked about a mile to a car they said belonged to Eskimo. Jonathan said they had done some criminal activity so the car could not be parked close to where they lived. They talked about bleaching the car. When they arrived at the area where the car was supposed to be, it was gone. Jonathan and Gary panicked that the police had found the car. Jonathan yelled at Gary about a bleach bottle. Jonathan threw away the keys to the car.

At the Nibbelinks' apartment with Mr. She[]persky, they told Ms. Monero that Eskimo had kept talking even after he had been hogtied, cut, and beaten. Ms. Monero called a friend for a ride, but she found out that the group was going to attempt to rob her friend. In the apartment, Ms. Monero heard that they had robbed Eskimo for his dope and $800.00 before killing him. They had already spent the money on drugs. Jonathan and Brian had dyed their hair

after the murder. She saw splatters of blood on the wall in the bedroom. At some point, she pretended to fall asleep on the bedroom floor. She then heard talk about raping her because they had told her too much. Mr. Shepersky eventually came into the bedroom and told her to not be scared because he would not let that happen. She was able to leave the apartment after she said she was going downstairs to get drugs. She never spoke to the group again. The police contacted her one or two days later.

Two men riding their four-wheelers in the woods found the skeletal remains of Eskimo, with a detached skull. A detective obtained his phone records and found that one of the last numbers he had called was the Nibbelinks'. Eskimo's DNA was obtained from swabs of blood from the apartment. A DNA profile that could have been from him was matched to blood from the trunk of the car. The medical examiner could not determine a cause of death due to the condition of the remains.

Gary Shepersky entered an open plea to second-degree murder, kidnapping, and robbery, for a sentence to be decided by the court after the trial. He admitted that he participated in the killing of Eskimo with Brian and Jonathan. He took various drugs with . . . them and they had discussed robbing Eskimo for drugs and money. Mr. Shepersky had never met Eskimo before the murder. The plan was for two of the men to hide out and for the third to act as a decoy.

Mr. Shepersky testified that Brian called Eskimo over to the apartment at night because Jonathan had problems with Eskimo. Mr. Shepersky and Jonathan came out of the closet after he walked into the bedroom and the group attacked him. Jonathan tried to choke him out, but failed. He and Brian tied Eskimo up with some rope. He and Jonathan beat him and Brian put a rag in his mouth. After Eskimo had been subdued in the living room, the

12

group consumed his heroin. They took his money, about $700. Eskimo eventually spit the rag out, screamed, and tried to escape. He put another rag down his throat. After they got high, they went to the living room to clean up the blood from Eskimo's nose. Brian poured cleaning fluid on Eskimo.

After the group cleaned the living room, they went back to the bedroom for about ten minutes to do more drugs. When they came back out, they realized Eskimo had died. They put his body into a sleeping bag and moved it into the trunk of his car. They stopped to buy more drugs before hiding the body in the woods at Mr. Shepersky's suggestion. They disposed of the rags and other things in a dumpster behind the store. They bought more drugs and a hotel room from Eskimo's money.

The next day, the group dyed their hair to disguise themselves and left Eskimo's car on a public street after wiping it down with bleach. They discussed the police finding the car and threw the keys away in front of Ms. Monero when they met up with her. They also discussed the murder back at their apartment in front of her. Mr. Shepersky admitted that he told three different stories to the police. At first he said he did not know anything about what had happened, then he tried to implicate everybody but himself, and finally he confessed his involvement.

Ex. G at 4-10.

## IV. Analysis

## A. Ground One

Petitioner argues that the trial court erred "by allowing the jury to deliberate with erroneous jury instructions." Doc. 1 at 3. He explains: "The jury instructions confused the jury about how it could find the Petitioner guilty,

13

they negated his sole defense, omitted instructions on how to evaluate his alleged out-of-court statements, and contained the problematic 'and/or' conjunction between his name and his brother's name." Doc. 5 at 2.

Petitioner, through counsel, raised this claim on direct appeal. Ex. H. The state filed an answer brief. Ex. I. The First District Court of Appeal per curiam affirmed Petitioner's convictions and sentences without issuing a written opinion. Ex. J.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Considering the jury instructions and the entire record, the Court finds this claim is due to be denied. Petitioner takes issue with several parts of the jury instructions. First, he argues that the "multiple counts, multiple defendants" instruction[4] deviated from the standard jury instruction and confused the jury. He contends that the modified "language did not clearly instruct the jury that its verdicts for Jonathan Nibbelink (the Petitioner's brother) could not be considered as to Petitioner." Doc. 5 at 2. He also argues that the "and/or" conjunction used between his name and his brother's name in the jury instructions "allowed the jury to convict the Petitioner based on the actions of his brother." *Id.* at 5.

---

[4] The instruction read: "A separate crime is charged in each count of the indictment and while they have been tried together each crime and the evidence applicable to it must be considered separately and a separate verdict returned as to each." Ex. C at 460.

14

Additionally, Petitioner argues "the jury was clearly not instructed that it did not have to find him guilty of felony murder if it found him guilty of robbery and that it had to return a separate verdict for each defendant." Doc. 5 at 3. He contends that the standard instruction about legally interlocking counts was not given. *Id.* He explains that "[t]his negated his defense that his other accomplices were more culpable and that he was only guilty of manslaughter." *Id.*

Contrary to Petitioner's argument, the trial court properly instructed the jury on the elements of each crime charged and the lesser-included offenses. The trial court repeatedly advised the jury that although the two brothers were being tried together in one case with one jury, their cases had to be considered separately. For instance, during voir dire, the judge stated: "[T]he indictment charges three separate offenses as to each of the two gentlemen. And, obviously, each case is tried separately, but we're going to try them all together with one jury, but your consideration about the case as to each defendant would be an individual consideration." Ex. D at 25.

Additionally, in the final jury instructions, the trial judge explained:

> One of the ways I've tried to simplify these instructions is to rather than read them twice, once for each defendant, I will read them once and it will have each defendants' name in the instructions, so it will streamline it a little bit.
>
> . . . .

But a separate crime is charged in each count of the indictment, and while they have been tried together, each crime and the evidence applicable to it must be considered separately and a separate verdict form is how you'll know to do that, because we've created it for you. As a general rule, a finding of guilty or not guilty as to one count or crime must normally not affect your verdict as to the others.

In this case, however, there is one exception to this general rule. The exception applies to the crime of first degree murder charged in Count 1, and the crime of robbery in Count 3. These crimes are linked because in order to prove the crime of felony murder, the State must also prove the defendant committed the robbery that's charged in Count 3.

If you find that the State has not proven the defendant committed a robbery, and find him not guilty as a result, then you may not find the defendant guilty of felony murder.

On the other hand, you may find the defendant guilty of felony murder if you find all of the elements of felony murder, including the essential elements of robbery were proven beyond a reasonable doubt.

. . . .

As far as the verdict forms are considered, there are three counts as to each defendant. *Each defendants' case has to be considered separately from the other. Each count has to be considered separately from the other.*

So, we have two sets of verdict forms for you, one for Jonathan Nibbelink, the other set is for Joshua Nibbelink. I'll just go over one set with you real quickly . . . . *[B]asically each verdict form is just a one page document as it relates to each count, so there's a total*

16

> *of six pages, three for Jonathan Nibbelink, three for*
> *Joshua Nibbelink.*

Ex. G at 688, 710-11 (emphasis added).

Considering the instructions as a whole, it is clear that the jury was instructed to consider each defendant individually as to each crime charged, and that the jury was properly instructed on the elements of the crimes.

Second, Petitioner argues that the jury was erroneously instructed on first degree premeditated murder—a crime with which he was not charged. Doc. 5 at 3. During opening statements, the jury was advised that premeditated murder was not at issue. *See* Ex. E at 226 (prosecutor stating, "And he's going to tell you it was not an accident. It was a robbery. Now, maybe the death was an accident."); 233 (defense counsel stating, "And the facts will clearly show that there was no premeditated design to cause the death of Mr. Martin."). When instructing the jury, the trial court stated: "In order to convict a defendant of first degree felony murder, it is not necessary for the State to prove that the defendant had a premeditated design or intent to kill." Ex. G at 690. Subsequently, the trial judge stated: "Your verdict as to the crime of first degree – well, there's not going to be one as to premeditated murder, that really doesn't apply." *Id.* at 711. The written instructions that the trial judge was reading from state: "Your verdict as to the crime of first degree premeditated murder is not affected by this exception to the general rule. As I instructed you

17

before, a finding of guilty or not guilty as to the crime of first degree premeditated murder as charged in Count I must not affect your verdict on Count II and Count III and vice versa." Ex. C at 460. The written instructions were not corrected and no party made an objection to the instructions as read by the judge. *Id.* at 719-20.

Considering the totality of the instructions along with the evidence and argument presented at trial, the jury was aware that premeditation was not a prerequisite to finding Petitioner guilty. The trial judge properly instructed the jury on the elements of the crimes charged and the jury's verdict is supported by the evidence.

Finally, Petitioner contends that the trial court erred by omitting the standard jury instruction regarding his out-of-court statements introduced through another witness. Doc. 5 at 4. Defense counsel had multiple opportunities to voice concerns about the jury instructions, but he did not request such an instruction be given. Even assuming a constitutional error occurred, considering the evidence presented, such error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

Upon thorough review of the record, the Court finds that the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Nor was the state court's

adjudication based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. As such, Ground One is denied.

## B. Ground Two

Petitioner argues that the trial court erred by allowing the admission of his co-defendant's confession implicating Petitioner. Doc. 1 at 4. According to Petitioner, the trial court violated his Sixth Amendment right to cross-examine his co-defendant "whose out-of-court statement referencing the Petitioner was introduced through the testimony of another state witness, Alexander Kulenok." Doc. 5 at 6.

Petitioner, through counsel, raised this claim on direct appeal. Ex. H. The state filed an answer brief. Ex. I. The First DCA per curiam affirmed Petitioner's convictions and sentences without issuing a written opinion. Ex. J.

The Court addresses this claim in accordance with the deferential standard for federal habeas review. At Petitioner's trial, Alexander Kulenok testified that a couple days after the murder, he was with Petitioner and Petitioner's brother (Jonathan Nibbelink) when Jonathan pulled him aside and told him "that he killed - - we killed E." Ex. E at 269. Kulenok further stated, "I believe he [(Jonathan)] told me that they had finally robbed him, and that he could have lived if he kept his mouth shut." *Id.* at 270.

Even assuming the trial court erred by allowing the subject testimony, any such error did not have a "substantial and injurious effect or influence in determining the jury's verdict" in light of the evidence presented. *Brecht*, 507 U.S. at 638. Jennifer Monero testified that she overheard "Gary, Jonathan, and Brian" talking about how "they had hogtied him [(the victim)] and they were trying to get someone else to rob and take more drugs and more money. They said they hogtied him, slit his throat and cut him." *Id.* at 345-46, 348. She further stated that "Brian said that when they were growing up he knew that they would be serial killers." *Id.* at 348. Additionally, Gary Shepersky testified that he, along with Jonathan and Brian Nibbelink, kidnapped, robbed, and killed the victim. *See id.* at 537-40, 544-47. Thus, even without Kulenok's testimony regarding what Jonathan told him, the evidence supported the jury's verdicts.

Upon thorough review of the record, the Court finds that the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. As such, Ground Two is denied.

## C. Ground Three

According to Petitioner, the trial court erred by trying Petitioner and his brother together. Doc. 1 at 5. He argues that because his brother did not put on any defense and Petitioner did, it made Petitioner seem more culpable. *See* Doc. 5 at 7-8.

Petitioner, through counsel, raised this claim on direct appeal. Ex. H. The state filed an answer brief. Ex. I. The First DCA per curiam affirmed Petitioner's convictions and sentences without issuing a written opinion. Ex. J.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. "'The Supreme Court has held that co-defendants do not suffer prejudice simply because one co-defendant's defense directly inculpates another, or it is logically impossible for a jury to believe both co-defendants' defenses.'" *Puiatti v. McNeil*, 626 F.3d 1283, 1316 (11th Cir. 2010) (quoting *United States v. Blankenship*, 382 F.3d 1110, 1125 (11th Cir. 2004)). The testimony and evidence was the same as to both Petitioner and his brother, as they committed the same crimes together. But the trial court properly instructed the jury to consider the defendants separately. Upon thorough review of the record, the Court finds that the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts given the

21

evidence presented in the state court proceedings. As such, Ground Three is denied.

### D. Ground Four

Petitioner argues that his appellate counsel was ineffective by failing to argue that Petitioner was deprived of the presence of counsel during critical stages of his proceeding. Doc. 1 at 6; Doc. 5 at 9. He explains that his trial counsel "failed to attend several court dates and had other persons appear in his absence who took actions without Petitioner Nibbelink's knowledge or approval." Doc. 5 at 9. Additionally, Petitioner's "appearance was waived and subsequently, motions for continuances were filed against his request." *Id.*

Petitioner raised this claim in a state court amended petition alleging ineffective assistance of appellate counsel. Ex. M. The First DCA denied the amended petition "on the merits." Ex. N.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Initially, the Court notes that Petitioner raised a similar claim in his Florida Rule of Criminal Procedure 3.850 proceeding, arguing that his trial counsel was ineffective. The state court recognized that Petitioner's trial counsel was absent from three pre-trial hearings. Ex. Q at 36. First, counsel did not appear on December 31, 2013, for the arraignment because he believed it was scheduled for January 6, 2014. *Id.* Petitioner did not enter a plea and his arraignment was rescheduled. *Id.*

Thus, the state court found that Petitioner suffered no prejudice. Second, Petitioner's trial counsel did not appear at two pretrial hearings, but both hearings were rescheduled and counsel appeared at the rescheduled times. *Id.* at 37. The state court found that these two hearings were not "crucial stages" of the litigation and "counsel's absence did not prejudice [Petitioner] or otherwise derogate from his right to a fair trial." *Id.*

Next, to the extent Petitioner argues that his counsel allowed others to appear on Petitioner's behalf, the state court found that another licensed attorney stood in for Petitioner's counsel at two pre-trial hearings and that such substitution did not prejudice Petitioner. *Id.* at 37-38. Finally, the state court acknowledged that Petitioner's presence was waived at three pre-trial hearings and one post-trial hearing, none of which prejudiced Petitioner or impacted the result of his case. *See id.* at 38-40. Indeed, only scheduling matters took place at the hearings. *See id.*

The Sixth Amendment guarantees the right to counsel at all critical stages of the criminal process. *See, e.g., Missouri v. Frye*, 566 U.S. 134, 140 (2012) (citing *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009)). Additionally, the Supreme Court has held that "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987); *see also Morris v. Sec'y, Dep't of Corr.*, 677

23

F.3d 1117, 1126 (11th Cir. 2012). Although the "privilege of presence is not guaranteed when presence would be useless, or the benefit but a shadow, due process clearly requires that a defendant be allowed to be present to the extent that a fair and just hearing would be thwarted by his absence." *Stincer*, 482 U.S. at 745 (internal citations and quotation marks omitted).

Upon thorough review of the record, it is clear that appellate counsel was not ineffective for failing to raise these issues, nor has Petitioner shown a reasonable probability that the outcome of his appeal would have been different had appellate counsel done so. As such, the Court finds that the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. As such, Ground Four is denied.

### E. Ground Five

Petitioner contends that his appellate counsel was ineffective for failing to argue that Petitioner's appearance was waived without a written consent form, nor was it knowingly or voluntarily waived. Doc. 1 at 7; Doc. 5 at 9-10. He argues that he "was not included in several court proceedings and therefore, he was denied his right to participate in his own defense and decision making process." Doc. 5 at 9. He asserts that his "counsel took actions without ever

24

consulting the Petitioner and filed motions for continuances when the Petitioner specifically requested they exercise his speedy trial options." *Id.* at 9-10.

Petitioner raised this claim in a state court amended petition alleging ineffective assistance of appellate counsel. Ex. M. The First DCA denied the amended petition "on the merits." Ex. N.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Under Florida law, "an attorney may waive speedy trial [and seek continuances] without consulting the client and even against the client's wishes." *McKenzie v. State*, 153 So. 3d 867, 875 (Fla. 2014), *on reh'g* (Dec. 11, 2014) (citing *McKenzie v. State*, 29 So. 3d 272, 282 (Fla. 2010)). Upon thorough review of the record, the Court finds that the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. As such, Ground Five is denied.

### F. Ground Six

Petitioner argues that his appellate counsel was ineffective for failing to obtain all transcripts for his direct appeal. Doc. 1 at 8. He asserts "that the pretrial transcripts unequivocally demonstrate the conflict between trial counsel and himself and that appellate counsel's failure to obtain them to show

prejudice constitutes ineffective assistance." Doc. 5 at 10. Specifically, he states that the transcripts would have shown that he requested counsel file a motion to suppress, and counsel did not "request the entire pretrial and speedy trial transcripts or the *Nelson*[5] hearing transcripts." *Id.*

Petitioner raised this claim in a state court amended petition alleging ineffective assistance of appellate counsel. Ex. M. The First DCA denied the amended petition "on the merits." Ex. N.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. The record reflects that Petitioner's trial counsel requested transcripts for the direct appeal of the hearings conducted on August 24-27, 2015, and September 2, 2015, which included the jury selection, trial, motions hearings, and sentencing. Ex. A at 518-19. The record further shows that Petitioner's trial counsel did file motions to suppress that the trial court denied or found moot. *Id.* at 75-88, 104, 146; Ex. C at 523-52.

Although not all transcripts were included in the record on direct appeal, Petitioner fails to show that his appellate counsel was ineffective. Regardless, even assuming appellate counsel was ineffective in the manner Petitioner suggests, Petitioner has not shown prejudice. He fails to show that a

---

5 *Nelson v. State*, 274 So.2d 256 (Fla. 4th DCA 1973).

reasonable probability exists that the outcome of his direct appeal would have been different had his appellate counsel ensured all transcripts were included in the record on appeal. Upon thorough review of the record, the Court finds that the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. As such, Ground Six is denied.

## G. Ground Seven

Petitioner contends that his appellate counsel was ineffective for failing to argue that the trial court never held an adequate *Nelson* hearing. Doc. 1 at 9. He argues that he requested a *Nelson* hearing because his lawyer had been withholding evidence and refusing to assist in the preparation of Petitioner's defense. Doc. 5 at 11. Petitioner asserts that "[t]he trial judge and counsel both attempted to dissuade the Petitioner from following through with the *Nelson* hearing and as such, petitioner Nibbelink was never afforded the opportunity to be heard in open court regarding his difficulties with counsel." *Id.*

Petitioner raised this claim in a state court amended petition alleging ineffective assistance of appellate counsel. Ex. M. The First DCA denied the amended petition "on the merits." Ex. N.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. The state court docket reflects that on June 25, 2015, Petitioner was present at a hearing where he withdrew his request for a *Nelson* hearing. Doc. 10-1 at 15. Petitioner has shown neither deficient performance nor resulting prejudice.

Upon thorough review of the record, the Court finds that the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. As such, Ground Seven is denied.

## H. Ground Eight

According to Petitioner, his appellate counsel was ineffective for failing to argue several instances of prosecutorial and police misconduct. Doc. 1 at 10. He contends that the prosecutor committed a *Giglio*[6] violation by offering the perjured testimony of Gary Shepersky. Doc. 5 at 12. He alleges that the prosecutor and lead detective "coerced the perjured testimony . . . by threats and intimidation to obtain a guilty verdict against the Petitioner." *Id.*

---

[6] *Giglio v. United States*, 405 U.S. 150 (1972).

Petitioner raised this claim in a state court amended petition alleging ineffective assistance of appellate counsel. Ex. M. The First DCA denied the amended petition "on the merits." Ex. N.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record, the Court finds that the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. As such, Ground Eight is denied.

## I.  Ground Nine

Petitioner argues that the postconviction court erred by denying his motion based on newly discovered evidence. Doc. 1 at 11. He contends that Gary Shepersky recanted his trial testimony, and the reason he lied at the trial was "because he was allowed to believe he would be receiving a sentence of what he thought would be five to ten years." Doc. 5 at 13.

Petitioner raised this claim in his postconviction motion filed pursuant to Florida Rule of Criminal Procedure 3.850. The state court held an evidentiary hearing on this ground, at which Petitioner appeared pro se. Petitioner called Gary Shepersky, former Detective Donnie Slayton, and former Assistant State Attorney Jeffrey Moody as witnesses. The State called investigator John

Sheppard as its witness. After the evidentiary hearing, the state court denied the claim:

> Defendant alleges newly discovered evidence in the form of recantation of trial testimony by witness, Gary Shepersky. In support of this allegation, Defendant attaches an affidavit from Shepersky, stating Defendant was not involved with or present when the victim, Mr. Martin, was killed and that Shepersky only testified Defendant was involved in order to avoid the death penalty or life in prison. Shepersky also stated he was coerced, scared, tired, and provided a false confession. Defendant maintains that as Shepersky was the only testifying eyewitness to the murder, his recantation would probably result in Defendant's acquittal upon a retrial.

> In order for a conviction to be set aside on the basis of newly discovered evidence, two requirements must be met: (1) "the evidence must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence" and (2) "the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial." *Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998) (citations omitted). "[R]ecanted testimony that is alleged to constitute newly discovered evidence will mandate a new trial only if (1) the court is satisfied that the recantation is true, and (2) the recanted testimony would probably render a different outcome in the proceeding." *Davis v. State*, 26 So. 3d 519, 526 (Fla. 2009) (citing *Armstrong v. State*, 642 So. 2d 730, 735 (Fla. 1994)). Because "recanting testimony is exceedingly unreliable . . . it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. Especially is this true where the recantation involves a confession of perjury." *Armstrong*, 642 So. 2d at 735 (quoting *Bell v. State*, 90 So. 2d 704 (Fla. 1956)).

30

As to the due diligence requirement, the Court notes "recanted testimony cannot be 'discovered' until the witness chooses to recant." *Davis*, 26 So. 3d at 528 (citing *Burns v. State*, 858 So. 2d 1229, 1230 (Fla. 1st DCA 2003)). Thus, even without the benefit of Defendant's trial counsel's testimony at the evidentiary hearing, the Court presumes Shepersky's recanted testimony could not have been discovered by counsel prior to trial.

The record establishes that Shepersky provided several different versions of what occurred during Mr. Martin's kidnapping and murder before fully confessing to police. In Shepersky's third or fourth version, he admitted he, Defendant, and Defendant's brother planned to rob Mr. Martin, together they attacked and tied up Mr. Martin, and after Mr. Martin died, they dumped his body in the woods. This version was substantially similar to the testimony he provided at trial.

At the evidentiary hearing, Shepersky testified his confession to detectives was a lie he fabricated based on what he thought they wanted to hear and which he believed would result in leniency for him. Shepersky stated he was led to believe he would be sentenced to ten-to-fifteen years[] imprisonment and, because of his cooperation, would not be charged with murder. After acknowledging his understanding of what perjury means, he admitted committing perjury during the trial. Ultimately, were a new trial to be held, Shepersky stated he would testify that no robbery or kidnapping ever took place, and that he fabricated the whole thing.

The Court is not satisfied that Shepersky's recantation testimony is true. Evidence tends to show Shepersky was coerced into recanting. At the evidentiary hearing, Shepersky testified he had received a letter from Defendant's father that included

31

case law about recantation evidence. Shepersky also admitted he was housed in the same prison as Defendant at the time he wrote one of the affidavits and was transferred to a different prison because he told prison officials he was afraid of Defendant. Further, it is clear that Shepersky was upset that the trial court sentenced him to twenty-five years[] imprisonment, instead of the ten-to-fifteen he believed he would receive, despite the risk he took in testifying against Defendant.

Moreover, Defendant's current version of events, i.e. that no robbery or kidnapping ever took place and that Shepersky fabricated the whole thing, is contradicted by the evidence adduced at trial. Witness, Jennifer Monero, corroborated key facts to which Shepersky had testified including that: Shepersky and the Nibbelink brothers had cleaned out Mr. Martin's car; after they realized the car was missing, Defendant's brother threw part of Mr. Martin's car keys into the river and another part into a portable toilet or dumpster; Mr. Martin was hogtied and his blood had spattered the apartment during the attack; and Shepersky and the Nibbelink brothers took several hundred dollars and drugs from Mr. Martin after the attack. Notably, Shepersky told detectives he and the Nibbelink brothers dumped Mr. Martin's body in the woods in Putnam County, which was where Mr. Martin's body was eventually found.

The Court further finds Shepersky's new testimony would not likely result in a different verdict, especially in light of the entirety of the evidence adduced at trial. The State presented evidence that Mr. Martin was missing when his bleached-down car was found by police, and his phone records showed one of the last calls he made was to one of the Nibbelink brothers. Blood discovered in the trunk of Mr. Martin's car and on the walls of the Nibbelinks's apartment matched Mr. Martin's deduced DNA profile. Surveillance photos from a hotel in St. Augustine show

> Shepersky and the Nibbelink brothers checking [in] the night that Mr. Martin went missing. And, in addition to Ms. Monero's testimony, witness, Alexander Kulenok, testified Defendant's brother bragged to him that they robbed and murdered Mr. Martin. Moreover, were Shepersky to testify at a new trial, he would be impeached with his prior inconsistent statements and felony convictions.
>
> For the foregoing reasons, the Court denies Defendant's request for a new trial based on Shepersky's recantation testimony.

Ex. Q at 27-30 (internal record citations omitted). Petitioner appealed, filing an initial brief, Ex. S, and the state filed an answer brief, Ex. T. Petitioner filed a reply. Ex. U. The First DCA per curiam affirmed the denial of his postconviction motion without issuing a written opinion. Ex. V.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record, the Court finds that the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. As such, Ground Nine is denied.

## J. Ground Ten

Petitioner complains that the postconviction court erred by denying his ineffective assistance of trial counsel claim regarding his counsel's failure to

object when the trial court restricted counsel's cross-examination of Detective Slayton. Doc. 1 at 12.[7] He explains that the trial court restricted counsel's ability to question Detective Slayton on "the interrogation tactics of co-defendant Gary Shepersky that ultimately led to his coerced and fabricated confession." Doc. 5 at 15-16.

Petitioner raised this claim in his Rule 3.850 proceeding. The postconviction court summarily denied the claim:

> Defendant alleges counsel was ineffective for failing to object when the trial court restricted his cross-examination of Detective Slayton, specifically, regarding the circumstances surrounding the conduct of the Jacksonville Sheriffs Office ("JSO") in obtaining Shepersky's confession.
>
> This claim is refuted by the record. On June 27, 2015, counsel filed a motion to suppress the police interview and testimony of Shepersky, among other evidence. On August 25, 2015, the Court heard argument of counsel on said motion. The Court denied the motion to suppress as to Shepersky's testimony, but indicated there was no need to address Shepersky's interview because there was no intention by the State to use the interview at trial. During counsel's cross-examination of Detective Slayton at trial, the State requested a sidebar due to a concern that counsel might be opening the door to testimony regarding Shepersky's interview, which would be contrary to the Court's ruling on the motion to suppress. Counsel argued his intention was to question Detective Slayton regarding the procedure he used in interviewing Defendant, his

---

[7] To the extent Petitioner argues that the postconviction court violated his due process rights by denying his request to file a second amended Rule 3.850 motion, such claim is insufficiently pled and due to be denied.

co-defendant, and Shepersky. However, the Court restricted counsel's cross-examination of Detective Slayton in order to prevent counsel from inadvertently opening the door to evidence he was entitled to keep out and to protect Defendant's right to appeal the suppression issues. Although not stated as an objection to the Court's ruling, counsel did argue his position for being able to question Detective Slayton on this issue. Accordingly, counsel was not deficient.

Notably, Defendant cannot demonstrate prejudice as counsel did in fact question Detective Slayton regarding his conduct in obtaining Shepersky's confession when the Detective was re-called to testify the following day.

Defendant is not entitled to relief on Ground Two.

Ex. Q at 31-32 (internal record citations omitted). Petitioner appealed, filing an initial brief, Ex. S, and the state filed an answer brief, Ex. T. Petitioner filed a reply. Ex. U. The First DCA per curiam affirmed the denial of his postconviction motion without issuing a written opinion. Ex. V.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record, the Court finds that the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. As such, Ground Ten is denied.

## K. Ground Eleven

According to Petitioner, the postconviction court erred by denying his claim that trial counsel was ineffective for failing to move to exclude the testimony of state witness Jennifer Monero. Doc. 1 at 13. Petitioner argues that counsel should have moved to exclude her testimony "because she was not properly deposed." Doc. 5 at 17. "More importantly, because she was not deposed until just six days prior to the Petitioner's trial, counsel had little or no time to investigate this witness and the candor of her deposition testimony." *Id.*

Petitioner raised this claim in his Rule 3.850 proceeding. The postconviction court summarily denied the claim:

> Defendant alleges counsel was ineffective for failing to move to exclude the testimony of witness, Jennifer Monero. Defendant contends Ms. Monero should not have been permitted to testify at trial because she was not sworn prior to being deposed and had ignored subpoenas.

> A discovery deposition taken pursuant to Florida Rule of Criminal Procedure 3.220(h) is "only admissible [at trial] for purposes of impeachment." *Blanton v. State*, 978 So. 2d 149, 155 (Fla. 2008). Similarly, a witness's unsworn telephonic statement "may be used for impeachment at trial as a prior inconsistent statement pursuant to the Florida Evidence Code." Fla. R. Crim. P. 3.220(h)(8).

> State's witness, Jennifer Monero, was telephonically deposed on behalf of Defendant, on August 20, 2015. Defendant is correct that Ms. Monero was not sworn prior to being deposed. However, the State stipulated to proceeding with the deposition

36

despite Ms. Monero being unsworn. During trial, Defendant's counsel attempted to impeach Ms. Monero with statements she made during her telephonic deposition. Thus, Defendant cannot demonstrate prejudice as the fact that Ms. Monero's deposition was unsworn had no bearing on its use at trial.

Further, "[a] witness who refuses to obey a duly served subpoena may be adjudged in contempt of the court from which the subpoena issued." Fla. R. Crim. P. 3.220(h)(l). "The exclusion of a witness is justified only after some lesser sanction, such as contempt or a writ of bodily attachment, has been attempted without success in making the witness attend a deposition." *State v. Gonzalez*, 695 So. 2d 1290, 1292 (Fla. 4th DCA 1997).

In its Response, the State concedes Ms. Monero failed to appear for a deposition scheduled in co-defendant, Jonathan Nibbelink's case, on January 28, 2015. Regardless, she did appear for deposition in this case on August 20, 2015. The Court would have denied a defense motion to exclude Ms. Monero as a witness for her failure to appear because no lesser sanction had been sought or attempted to compel her appearance and because she did ultimately appear for deposition. Counsel cannot be deemed ineffective for failing to make a meritless argument. *See Teffeteller*, 734 So. 2d at 1023.

Defendant is not entitled to relief on Ground Three.

Ex. Q at 32-33 (internal record citations omitted). Petitioner appealed, filing an initial brief, Ex. S, and the state filed an answer brief, Ex. T. Petitioner filed a reply. Ex. U. The First DCA per curiam affirmed the denial of his postconviction motion without issuing a written opinion. Ex. V.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record, the Court finds that the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. As such, Ground Eleven is denied.

### L. Ground Twelve

Petitioner contends that the postconviction court erred by denying his claim that his trial counsel was ineffective for failing to impeach Alexander Kulenok's trial testimony with his prior inconsistent statements. Doc. 1 at 15. He claims "that counsel had recorded statements previously offered by Mr. Kulenok and could have refreshed the witness's memory by showing him the documents." Doc. 5 at 18. Petitioner acknowledges that "[u]nexplainably, Counsel Simmons made a strategic decision not to impeach the witness with this evidence." *Id.*

Petitioner raised this claim in his Rule 3.850 proceeding. The postconviction court summarily denied the claim:

> Defendant alleges counsel was ineffective for failing to impeach witness, Alexander Kulenok, with a prior inconsistent statement. Specifically, Defendant claims Mr. Kulenok testified at trial that Defendant discussed robbing the victim prior to the victim's death,

38

but that during a police interview, Mr. Kulenok stated he did not hear Defendant discussing same. Defendant further claims that had counsel impeached Mr. Kulenok with this inconsistency, another witness, Stan Kulenok, also would have been impeached.

During Mr. Kulenok's direct examination, he testified he had conversations with Defendant about robbing drug dealers and that the victim's name was specifically mentioned. During cross-examination, defense counsel questioned Mr. Kulenok about his previous conversation with the police:

Q: Now, do you recall speaking to the police back in March or April of this year, correct?

A: Yes.

Q: Okay. And do you recall telling the police that you never heard Brian say anything about robbing, correct?

A: I don't -- I don't recall that.

Q: So, if the police made a report and stated that when asked about talking about robbery and you said you never heard Brian talk about robbery, that would be incorrect?

A: I cannot remember, sir.

Q: Okay. Were you on drugs then as well?

A: Yes.

Thus, the record shows that counsel did, in fact, bring to the jury's attention that Mr. Kulenok made prior inconsistent statements and impeached him with his drug use. Notably, an attempt to impeach Mr. Kulenok with his prior inconsistent statement when he stated he had no recollection of making the statement

39

would have been improper. *See James v. State*, 765 So. 2d 763, 766 (Fla. 1st DCA 2000) (citation omitted) ("[I]t was error to allow the impeachment because Jones' trial testimony that he had no recollection was not truly inconsistent with his previous statement."). Accordingly, the Court finds trial counsel was not deficient as it relates to this claim.

Defendant is not entitled to relief on Ground Four.

Ex. Q at 34-35 (internal record citations omitted). Petitioner appealed, filing an initial brief, Ex. S, and the state filed an answer brief, Ex. T. Petitioner filed a reply. Ex. U. The First DCA per curiam affirmed the denial of his postconviction motion without issuing a written opinion. Ex. V.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record, the Court finds that the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. As such, Ground Twelve is denied.

Accordingly, it is

**ORDERED**:

1.    The Order to Show Cause (Doc. 14) is **DISCHARGED**. *See* Petitioner's Response (Doc. 15).

2.     The Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (Doc. 1) is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**.

3.     The **Clerk of Court** shall enter judgment accordingly, terminate any pending motions, and close this case.

4.     If Petitioner appeals, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[8]

**DONE AND ORDERED** at Jacksonville, Florida, this _____ day of March, 2024.

_____
UNITED STATES DISTRICT JUDGE

JAX-3 3/6
c:
Joshua Nibbelink, #L98289
Counsel of record

---

[8] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.